Ernest J. FILIBERTI & Domell Dysthe, Petitioners-Appellants,

v.

MERIT SYSTEMS PROTECTION BOARD, Respondent-Appellee.

Ernest J. FILIBERTI, Petitioner,

v.

MERIT SYSTEMS PROTECTION BOARD, Respondent.

Nos. 85–7010, 85–7354.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 2, 1986.

Decided Nov. 26, 1986.

■■■■■■■■■■■■■■■■■■■■■■■■■

---

Robert A. Reutershaun, Asst. Director, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, D.C., for petitioners-appellants.

Calvin M. Morrow, Office of the Gen. Counsel, Merit Systems Protection Bd., Washington, D.C., for respondent-appellee.

Before GOODWIN, WALLACE, and ANDERSON, Circuit Judges.

WALLACE, Circuit Judge:

Filiberti and Dysthe appeal from a Merit Systems Protection Board (Board) ruling upholding a determination by an Adminis-trative Law Judge (ALJ) that they improperly influenced an applicant for a position to withdraw his application from consideration. The Board had jurisdiction pursuant to 5 U.S.C. § 1205(a)(1). We have jurisdiction under 5 U.S.C. § 1207(c). We affirm the Board's decision except for the penalty ultimately given to Filiberti, an issue we reverse and remand to the Board for further proceedings.

I

At the time this suit was instituted, Filiberti was the civilian personnel officer (CPO) for the Military Sealift Command Pacific (MSCPAC), a position he had occupied since 1974. MSCPAC is a division of the Department of the Navy, providing ocean transportation for various government agencies. Filiberti had approximately 40 years of experience in personnel for the government and was directly responsible for staffing over 2,600 positions.

Dysthe worked directly under Filiberti as director of the MSCPAC employment division. Dysthe had 28 years experience in personnel administration. Both men worked autonomously, receiving only broad policy supervision from their superiors.

In October 1980, the Office of Personnel Management (OPM) delegated authority to MSCPAC to select applicants for a position classified as a "Supervisory Marine Transportation Specialist." The position, informally known as "port captain," is unique in MSCPAC. Filiberti was chosen to serve on a five member selection panel. Dysthe served as an advisor to the panel.

The position was advertised in November and December 1980. The panel screened a number of applicants, eventually offering the position to Bruno, the highest ranked available candidate. Bruno accepted the offer and began serving as port captain in May of 1981.

In November 1981, OPM personnel conducted a routine audit of the screening panel's selection process. The auditors discovered that the panel had incorrectly undervalued the veteran preference due an-

other applicant, McCracken, resulting in his improper placement lower on the hiring register than the non-veteran Bruno.

Before the audit was finalized, the OPM personnel suggested to Filiberti that he contact McCracken to determine whether he was still interested in the position. Dysthe wrote McCracken, telling him of the error and informing him that the position might still be available. McCracken indicated that he was still interested. On December 9, the OPM sent Filiberti a copy of its final audit report, in which it ordered Filiberti to "make a determination as to the preference status of [McCracken]" and, if necessary, to "regularize the appointment." Because the position was unique, Bruno could only be retained if OPM authorized MSCPAC to "pass over" McCracken, or if McCracken withdrew his application.

Late in December, Filiberti requested authority to pass over McCracken and retain Bruno. In his request, Filiberti admitted that McCracken was basically qualified, but argued that his lack of "sea-going experience" made him less suited to perform the "critical duties" of the position. Evidence at the pass-over hearing, however, indicated that sea-going experience was not required. Dysthe told McCracken that the personnel office was going to request the pass-over, but did not inform him that he had a statutory right to oppose the request.

OPM denied the request, and ordered Filiberti to offer the position to McCracken. Instead of doing so, Filiberti sent McCracken a letter, drafted by Dysthe, informing him that final action was still "pending." This letter, dated February 10, 1982 (the February letter), contained a number of pessimistic statements which, Filiberti and Dysthe contend, were intended to help McCracken make a more informed decision. For example, the letter informed McCracken that his moving expenses would not be paid; that the position required extensive travel at a moment's notice; that McCracken might have his military retirement pay reduced if he accepted the position; that the cost of living in the San Francisco Bay area, the situs of the job, was high; and

that a merger with the Army was anticipated, with untold effects on the position. McCracken interpreted the letter as an attempt to influence him not to take the position and inquired in a reply letter whether he would "encounter a hostile atmosphere if [he] should replace the incumbent." Filiberti responded on March 9, disclaiming any inference of negativism, and requesting that McCracken make a "final decision" as soon as possible. Filiberti admitted that neither the March 9 nor the February letter constituted an offer of employment.

McCracken subsequently withdrew his application, stating that he did "not wish to become involved in a Donnebrook [sic] not of [his] making." McCracken also indicated that he wished to be reconsidered for the position if it became available in the future.

Filiberti advised OPM of McCracken's withdrawal, enclosing copies of the correspondence between McCracken and MSCPAC. OPM referred the correspondence to special counsel for investigation. In August of 1983, the special counsel filed charges, alleging that Filiberti and Dysthe had improperly exercised their authority to influence McCracken to withdraw in violation of 5 U.S.C. § 2302(b)(5), 5 C.F.R. § 4.3 (1982), and 5 C.F.R. § 330.601 (1982). After a hearing, on July 20, 1984, the ALJ found that the charges against Filiberti and Dysthe were sustained by a preponderance of the evidence. He recommended that the two men be suspended for 60 days. Filiberti and Dysthe appealed to the Board, which rejected their arguments and adopted the ALJ's decision.

Filiberti subsequently retired on the day his suspension was to begin. The special counsel moved the Board to modify its order to impose an alternative penalty. The Board ordered that a sum equivalent to the amount of salary that Filiberti would have forfeited had he served during his suspension be withheld from his accrued leave pay. Filiberti and Dysthe filed a timely appeal.

**1508**

## II

Our role in reviewing decisions of the Board is very narrow. Under 5 U.S.C. § 7703(c), we can set aside a Board decision only if it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) if the Board failed to follow proper procedures; or (3) if the decision was unsupported by substantial evidence. Similarly, while we review interpretations of law de novo, we afford great deference to an agency's interpretations of the statutes and regulations it is charged with administering. *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *Debose v. United States Department of Agriculture,* 700 F.2d 1262, 1266 (9th Cir.1983).

### A.

Filiberti and Dysthe attack the sufficiency of the complaint filed against them. In the first count of his complaint against Filiberti and Dysthe, the special counsel charged them with "exercising their authority to influence Francis C. McCracken ... to withdraw from competition for the purpose of *securing* the unlawful appointment of George I. Bruno, Jr. . . . . ." (emphasis added) This action, the complaint alleged, violated 5 U.S.C. § 2302(b)(5):

Any employee who has authority to take ... any personnel action, shall not ...

(5) influence any person to withdraw from competition for any position for the purpose of improving or injuring the prospects of any other person for employment. . . .

Since the ALJ found that Bruno was already an employee at the time of the improper acts, Filiberti and Dysthe argue that they could not be and were not found guilty of *securing* the appointment of Bruno. Instead, they argue that the evidence shows only that they acted to *maintain* Bruno's employment. This variance, coupled with a failure to amend the complaint, they argue, justifies reversing the Board's decision.

■ Filiberti and Dysthe's argument ignores the well established rule that administrative pleadings are to be liberally construed. *Donovan v. Royal Logging Co.,* 645 F.2d 822, 826 (9th Cir.1981). They would have us interpret the word "secure" as being synonymous with "acquire" or "procure." As the Board points out, "secure" can as easily be construed to mean "make safe," "maintain" or "put beyond hazard of losing." In the context of the case before us, the Board's interpretation of the word *secure* is the more appropriate. Bruno was not a permanent employee in the normal sense of the term. Even though he had assumed the position as port captain, his continued right to hold that position was conditioned on McCracken withdrawing his application. If McCracken did not withdraw his application, Bruno had no claim to the office. Bruno had neither the status nor the tenure of a regular employee. Given this uncertain situation, it is clear that Bruno's position had not yet been "secured" with the definitiveness that the word normally denotes. Bruno's situation was more analogous to that of an "applicant" than to that of an "employee."

Even if there was a variance between the complaint and proof, Filiberti and Dysthe have not shown that they did not have notice of the nature of the charges against them or that they suffered any prejudice. While the language of the portion of the complaint at issue may not have been entirely unambiguous, read in the context of the underlying factual dispute and the wording of the rest of the complaint, it is clear that the special counsel alleged essentially the violation that was proved at the hearing. The complaint gave Filiberti and Dysthe notice of both the fact pattern and the statutory provisions upon which special counsel would rely. Filiberti and Dysthe have not suggested any different or additional evidence they would have introduced had the complaint been amended. They had notice of the charges before them, and suffered no prejudice from the alleged variance. Absent such a showing as would " 'affect the substantial rights' of the accused," we will not upset the Board's decision. *United States v. Miller,* 471 U.S.

130, 134, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985); *see also Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

### B.

■ Nor can we agree with Filiberti and Dysthe's contention that the conduct alleged in the complaint is not enjoined by section 2302(b)(5). Their reading would render the statute inoperative as soon as an "applicant" was designated an "employee." Although the words "improving or injuring the prospects of any other person for employment" are not free from ambiguity, we conclude the statute cannot be restricted to the interpretation for which Filiberti and Dysthe argue.

As recognized by the ALJ, the legislative history of the statute demonstrates a broad intent to protect all phases of the hiring process from improper influences. The Senate Report analyzing section 2302(b)(5) indicated that this provision was designed to "prohibit influencing a person to withdraw from competition in order to assist or injure *another's* prospects." S.Rep. No. 969, 95th Cong., 2d Sess. 21, *reprinted in* 1978 U.S.Code Cong. & Admin.News 2723, 2743 (emphasis added). That other's prospects in this case would refer to McCracken.

Similarly, the legislative history reveals that both the House and Senate originally used the word *applicant* in this section but subsequently dropped it, replacing it with the broader "any other person for employment" language. *See* H.R. 11280, 95th Cong., 2d Sess. § 2302(b)(5) (1978); S. 2640, 95th Cong., 2d Sess. § 2302(b)(5) (1978). The use of this broader language strongly suggests that the statute should not be construed to be inapplicable to the facts of this case.

As indicated above, Bruno is, in the facts of this case, more like an applicant than an employee. As such, Filiberti and Dysthe can be charged under section 2302(b)(5) with improperly "improving the prospects of [Bruno] for employment." They may also be charged with "injuring the pros-

pects of [McCracken] for employment." The statute is sufficiently broad to cover the charges made in this case.

### C.

Filiberti and Dysthe were also found to have violated a personnel rule, 5 C.F.R. § 4.3 (1982), and a regulation, 5 C.F.R. § 330.601 (1982). The relevant language of these provisions largely tracks 5 U.S.C. § 2302(b)(5). However, the rule is limited to the exercise of influence for the purpose of "improving or injuring the prospects of any applicant for appointment." Similarly, the regulation prohibits influence exercised to improve or harm the prospects "of an applicant or eligible for appointment." The ALJ did not base his decision on the theory that Bruno was the functional equivalent of an applicant, and that therefore Filiberti and Dysthe acted to "improve the prospects of an applicant." Instead, he interpreted this section as prohibiting an employee from influencing an applicant for the purpose of injuring *that* applicant's prospects. Under this reading, Filiberti and Dysthe's actions would have violated these provisions because they influenced McCracken to withdraw his application for the purpose of injuring McCracken's own employment prospects.

Filiberti and Dysthe disagree, arguing that the provisions only prohibit influencing an applicant for the purpose of injuring or aiding the prospects of a *different* applicant. The ALJ's interpretation, they argue, would prohibit a government employee from counseling an applicant to withdraw for a legitimate reason, as where the employee does not feel that the applicant is qualified, or where a better position is available.

■ While the ALJ could have held, as we have, that Filiberti and Dysthe acted to improve the prospects of "an applicant," his alternative interpretation of the regulations is reasonable. The plain language of the two provisions prohibits influence to the benefit or detriment of "any applicant" (§ 4.3) and "an applicant" (§ 330.601)—not

"another applicant" or "a different applicant." This interpretation comports with the legislative history of section 2302(b)(5) discussed earlier. Furthermore, contrary to Filiberti and Dysthe's contentions, this interpretation does not bar an employee from counseling an applicant to withdraw for legitimate reasons. These provisions are violated only when the employee acts with the *purpose* of harming the applicant's chances. While counseling withdrawal for a legitimate reason may well have the effect that the individual will not become employed, this is not what the statute prohibits.

Finally, Filiberti and Dysthe contend that they were charged with attempting to *secure* Bruno's appointment, not attempting to *hinder* McCracken's chances for employment, and therefore were found guilty under the regulations of a charge that was never pled. We reject this contention because, like the variance claim arising under the statute, see part B, the parties were clearly on notice regarding the claims arising under the regulations, and suffered no prejudice.

### III

Filiberti and Dysthe also claim that the Board's decision was arbitrary, capricious, and unsupported by substantial evidence. Here too, the scope of our review is very narrow: we must affirm the Board's decision if we find in the record as a whole such evidence "as a reasonable mind might accept as adequate to support [the] conclusion, even if it is possible to draw two inconsistent conclusions from the evidence." *St. Elizabeth Community Hospital v. Heckler,* 745 F.2d 587, 592 (9th Cir. 1984) (citations omitted).

■ The record indicates that Filiberti, with Dysthe's help, sent a letter to McCracken containing unsolicited, discouraging remarks. While the information in that letter may not have been incorrect, the ALJ found that it was sent to McCracken for the *purpose* of dissuading him. This is all the statute, rule, and regulation require. Filiberti and Dysthe testified that this was

not their intent. That testimony does not help them on appeal because the ALJ found their testimony was "not ... credible." On the issue of credibility, we defer to the Board.

Moreover, Filiberti never officially offered the job to McCracken, despite a direct order from OPM that he do so. The record also shows that Filiberti and Dysthe submitted misleading information designed to help Bruno in their pass-over request, while at the same time failing to inform McCracken that he had an absolute right to oppose the pass-over request. This strongly suggests an intent to damage McCracken's chances of employment.

Filiberti and Dysthe argue that they were acting in good faith in an attempt to remedy an unfortunate situation. That may be so, but it does not change that fact that they acted "for the purpose of improving or injuring the prospects" of Bruno and McCracken respectively. 5 U.S.C. § 2302(b)(5). The Board's findings are supported by substantial evidence.

### IV

Filiberti and Dysthe's next claim is that the 60 day suspension was excessive. The scope of our review of a sentencing decision by the Board is very narrow. We will defer to the Board's judgment "unless the penalty is so harsh or disproportionate to the offense as to constitute an abuse of discretion." *McClaskey v. United States Department of Energy,* 720 F.2d 583, 586 (9th Cir.1983).

Both sides concede, and we concur, that the ALJ correctly adopted the standards set out in *Douglas v. Veterans Administration,* 5 M.S.P.B. 313, 5 M.S.P.R. 280 (1981), for determining the appropriate disciplinary measure. Applying *Douglas,* the ALJ properly considered the seriousness of the offense, the positions of authority of Filiberti and Dysthe, their continued ability to function effectively, and the damage to the image of MSCPAC as factors supporting the suspension. The years of experience, job grades, and deliberate nature of

the behavior of Filiberti and Dysthe were also considered as factors militating against merely nominal disciplinary measures. The ALJ also properly considered a number of mitigating factors, such as the untarnished work records of Filiberti and Dysthe, their potential for rehabilitation, and the fact that they were genuinely concerned about Bruno's welfare. The record supports facts the ALJ considered in determining proper sanctions.

■ Although the ALJ followed appropriate procedures, Filiberti and Dysthe argue that he should have considered four additional mitigating factors: (1) the violations were technical in nature and not done for malevolent reasons; (2) their actions were carried out with the approval and at the direction of their supervisors; (3) they did not act secretly; and (4) McCracken was not injured because he would not have accepted the position anyway. We will address these contentions in turn.

The first factor Filiberti and Dysthe cite was considered and weighed against them by the ALJ, who specifically found that their illegal conduct "resulted from [a] deliberate attempt to avoid the law and injure the employment prospects of McCracken, and improve those of Bruno." As held above, this conclusion was supported by substantial evidence.

The record does not support Filiberti and Dysthe's second contention. They had a combined total of 68 years in federal personnel administration. They worked autonomously, receiving "only broad policy supervision" from their supervisors. The involvement of the Commander of MSCPAC and the OPM in Filiberti and Dysthe's activities was inconsequential.

As to the third factor, it is commendable that Filiberti and Dysthe acted openly. This alone, however, does not render the suspension unreasonable.

Filiberti and Dysthe's fourth factor— that McCracken was not injured because he would not have accepted the position had it been offered—is unpersuasive. In May 1983, McCracken, who had moved from California to Florida, was again offered the port captain position. He did not accept the offer, stating that "[h]ad I been offered the prior position two years ago while living in California I would have been able to accept." Because the prohibited acts occurred after McCracken moved, Filiberti and Dysthe extrapolate from McCracken's 1983 refusal that he would have also turned down the port captain job had it been offered to him in May 1981. Filiberti and Dysthe presume too much. There is no evidence in the record to indicate that McCracken would not have accepted the 1981 offer had Filiberti and Dysthe not engaged in the prohibited activity. In fact, his 1982 letter withdrawing himself from consideration indicated that McCracken was still interested in the port captain position or its equivalent. The record does not support the argument of Filiberti and Dysthe.

V

■ Filiberti's final claim is that the Board did not have the authority to withhold the equivalent of 60-days' salary from his accrued leave pay in lieu of the suspension. The scope of the Board's sanctioning authority is defined by statute:

(b) A final order of the Board may impose disciplinary action consisting of removal, reduction in grade, debarment from Federal employment for a period not to exceed 5 years, suspension, reprimand, or an assessment of a civil penalty not to exceed $1,000.

5 U.S.C. § 1207(b). The wording of this section obviously does not authorize the Board to impose the chosen sanction. Where a statute specifies particular remedies, we must be chary of expanding available remedies beyond what Congress explicitly provided. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19–20, 100 S.Ct. 242, 246–247, 62 L.Ed.2d 146 (1979). As a creature of Congress, the Board is limited "not [to] what the Board thinks it should do but [to] what Congress has said it can do." *Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S.

316, 322, 81 S.Ct. 1611, 1617, 6 L.Ed.2d 869 (1961).

The Board, however, argues that it was not exercising its sanctioning authority pursuant to section 1207(b) when it imposed the alternative penalty, but rather its authority to enforce compliance with its original order. The Board contends that Filiberti attempted to circumvent its 60-day suspension without pay order by retiring the day it was to commence. Thus, argues the Board, its alternative penalty of deducting the amount of 60-days' pay from Filiberti's accrued annual leave merely enforces compliance with its prior order. The power to do so, the Board argues, is derived from 5 U.S.C. § 1205(a)(2), which authorizes it to "order any Federal agency or employee to comply with any order or decision issued by the Board ... and enforce compliance with any such order."

■ This section, however, does not give the Board carte blanche to do whatever is necessary to enforce its orders. We must remind ourselves that, in spite of the logic of the Board's contention, the effect would be to extend the sanctioning authority beyond that which is specifically prescribed by section 1207(b). This is especially true pertaining to the Board's authority to forfeit employee pay, which is limited by section 1205(d)(2):

> In enforcing compliance with any order under subsection (a)(2) of this section, the Board may order that *any employee* charged with complying with such order, ... shall not be entitled to receive payment for service as an employee during any period that the order has not been complied with....

(emphasis added.) This section does not support the forfeiture penalty because Filiberti was not an employee during the period the sanctioning order was violated.

■ Bearing in mind the specific teaching of the Supreme Court to be wary of expanding authority beyond the particular agency remedies Congress dictates, we hold that the Board may not circumvent the specific, narrow sanctioning authority set out in section 1207(b). The broad dictates of section 1205(d)(2) do not empower the Board to create and impose new penalties not envisaged by Congress in section 1207(b). Therefore, we reverse and remand this issue to the Board to reconsider Filiberti's penalty in light of the sanctioning constraints imposed by Congress.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.