STATE OF CALIFORNIA, ex rel. STATE WATER RESOURCES BOARD, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Rock Creek Limited Partnership, Intervenor.

No. 87–7538.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 16, 1988.

Submission Withdrawn Jan. 5, 1989.

Resubmitted Jan. 27, 1989.

Decided June 6, 1989.

John K. Van de Kamp, Atty. Gen., State of Cal., Clifford T. Lee and Roderick E.

---

Walston, Deputy Attys. Gen., San Francisco, Cal., for petitioner.

Catherine C. Cook, General Counsel, Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., for respondent.

Louis Touton, Jones, Day, Reavis & Pogue, Los Angeles, Cal., for intervenor.

Before HUG, TANG and BOOCHEVER, Circuit Judges.

HUG, Circuit Judge:

The State of California petitions us to review the Federal Energy Regulatory Commission's decision finding exclusive federal control over the setting of hydroelectric power project water flow rates. After examining the preemption implications of the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a–825r (1982 & Supp. V 1987), we affirm the Commission's conclusion that the Act awards the federal government sole authority to set flow rates.

## BACKGROUND

Rock Creek is a small tributary of the South Fork of the American River near Placerville, California. Rock Creek runs entirely within the state of California and lies on public lands administered by the U.S. Bureau of Land Management.

The Rock Creek Limited Partnership chose the creek as the site for a small hydroelectric power project. They proposed a project that will consist of a concrete diversion dam located about one mile upstream from Rock Creek's confluence with the American River. The dam will divert water through a tunnel into three penstocks, and then into a powerhouse equipped with three turbine generators having a total capacity of 3,000 kilowatts. After passing through the powerhouse, the water will empty into the American River about one mile down stream. The pen-

stocks and powerhouse will be built on the site of an older powerhouse and penstock complex. The project is expected to generate about 7,000 megawatt-hours of electricity annually. The Pacific Gas & Electric Company will purchase the project's power.

The dam will divert some of the water flow from Rock Creek into the power project and leave the remainder of the water to flow in its natural course in Rock Creek. The minimum amount of water flow that must be left in Rock Creek, denominated the "minimum flow rate," is the principal point at issue in this case.

In April, 1983, after submission of an application by the Partnership, the Federal Energy Regulatory Commission ("FERC") issued a license for the project's construction and operation. Article 37 of the license fixed an interim minimum flow rate of eleven cubic feet per second ("cfs") from May to September, and fifteen cfs from October through April. These flow rates would apply until the project's sponsors satisfied the provisions of Article 38, which requires the owners to conduct long-term minimum flow rate studies in conjunction with the California Department of Fish and Game ("DFG").

In February, 1984, the California State Water Resources Control Board ("WRCB") issued two permits to the project for the appropriation of Rock Creek's water. These permits incorporated the federal license's interim minimum flow figures and reserved jurisdiction to the WRCB to set permanent rates after completion of the long-term studies. The permits noted that Rock Creek serves as an important source of adult trout for the Rock Creek–American River system. California law in effect at the time the permits were issued charged the WRCB with subjecting appropriations "to such terms and conditions as in its judgment will best develop, conserve, and utilize in the public interest" the water affected by the permits. Cal. Water Code § 1257 (West 1971).[1]

---

1. California cites the Water Code at section 1257.5 for the proposition that the WRCB may impose streamflow requirements necessary to protect fish and wildlife. Cal. Water Code § 1257.5 (West Supp.1989). California added this provision to its Code in 1985. The WRCB issued the Rock Creek permits in 1984. Section 1257.5, therefore, does not apply.

In July, 1986, the project's sponsors petitioned for a declaratory order stating that FERC had exclusive jurisdiction to establish permanent minimum flow rates. About eight months later, in March, 1987, FERC issued a declaratory order in which it held that "[t]he imposition of minimum flow releases for fishery protection and other purposes is an integral part of the Commission's comprehensive planning and licensing process under section 10(a) of the Federal Power Act." 38 FERC ¶ 61,240 (1987) (footnote omitted). In addition to citing the FPA, the Commission relied on *First Iowa Hydro–Electric Coop. v. FPC*, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946), for authority to preempt state regulation of flow rates.

A few days after FERC issued its declaratory order, the WRCB amended its permits in response to the DFG's completion of the fishery studies. On the DFG's recommendation and after a hearing in which the project's sponsors disputed the studies, the WRCB increased minimum flow rates to permanent levels of sixty cfs from March through June and thirty cfs from July through February. In the order amending the permits the WRCB stated that *First Iowa* did not support federal preemption of this issue and that the WRCB had "jurisdiction in this matter to regulate the Rock Creek project, notwithstanding the concurrent exercise of jurisdiction over other aspects of the project by FERC." WRCB Order WR 87–2 (1987).

The State of California then filed with FERC a motion for intervention on behalf of the WRCB and requested a rehearing of the declaratory order. The rehearing petition raised as its sole argument the question of federal preemption under the FPA of flow rate setting powers. FERC granted the intervention motion but denied, in November, 1987, the rehearing request.

California filed a timely petition in this court in December, 1987, seeking review of the declaratory order and the order denying rehearing. It presents the issue of whether the FPA vests exclusive authority in FERC to set minimum flow requirements for hydroelectric power projects licensed under the Act.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 16 U.S.C. § 825*l* (b) to review decisions issued by the Commission. Our jurisdiction is limited to objections raised in the petitioner's application for rehearing before the Commission. 16 U.S.C. § 825*l* (b) (1982); *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir.1988).

Our review of the decision at issue in this appeal is respectful but searching. Generally, we may reverse the Commission's orders only if we find them arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law. 5 U.S.C. § 706(2)(A) (1982); *City of Centralia, Wash. v. FERC*, 799 F.2d 475, 481 (9th Cir.1986); *The Steamboaters v. FERC*, 759 F.2d 1382, 1388 (9th Cir.1985). California challenges, however, the Commission's determination of purely legal questions involving the construction of the FPA. Since this case involves only issues of statutory interpretation, the high degree of deference associated with the arbitrary and capricious standard, *see Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir.1989), is considerably relaxed. While we accord deference to the construction of a statute by those charged with its administration, *Filiberti v. Merit Sys. Protection Bd.*, 804 F.2d 1504, 1508 (9th Cir. 1986); *City of Centralia*, 799 F.2d at 481, we keep in mind that the courts are the final authorities on issues of statutory construction, *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981); *Tulalip Tribes of Wash. v. FERC*, 732 F.2d 1451, 1454 (9th Cir.1984). The justification for deference to an agency's interpretation of a statute decreases when the statutory construction requires consideration of broad concerns beyond the agency's expertise. *Grunfeder v. Heckler*, 748 F.2d 503, 505 (9th Cir.1984) (en banc). The FERC decision in this case deals not with the technical aspects of the FPA but with general issues of preemption and the divi-

sion of regulatory authority between state and federal governments. These subjects belong to the sphere of judicial rather than agency expertise.

## ANALYSIS

California asserts that neither the terms of the FPA nor case law interpreting it authorize federal preemption of state laws dealing with the acquisition of water rights and the conditions attached to the exercise of those rights. California offers two main lines of argument. First, it claims that section 27 of the FPA, codified at 16 U.S.C. § 821 (1982), is an anti-preemption provision requiring projects licensed under the FPA to comply with state water rights and usage laws. Second, it argues that *First Iowa* is distinguishable and not on point. California relies heavily on the FPA's legislative history and on the Supreme Court's holdings in *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), for these arguments.

Against California's contentions, FERC argues that the FPA vests comprehensive hydropower planning authority in the federal government generally and in FERC specifically. It claims that this authority amounts to a clear grant of preemption. It also argues that *First Iowa* recognized and approved this preemption and that *California v. United States* is irrelevant to the issues at hand.

### I. *Preemption*

Preemption analysis always starts with the presumption that Congress did not intend to displace state law. *See, e.g., Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). However, as the Court has stated:

Such a purpose [to displace state law] may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominate that the federal system will be assumed to preclude enforcement of state laws on

the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it might reveal the same purpose. Or the state policy may produce a result inconsistent with the objective of the federal statute.

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230–31, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). "Even when Congress has not entirely displaced state regulation in a specific area, state law is pre-empted to the extent that it actually conflicts with federal law." *Pacific Gas & Elec. v. Energy Resources Comm'n*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). A state law conflicts with federal law when it is physically impossible to comply with both or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Our task is to examine the FPA to determine how Congress intended to divide authority between the states and the federal government over hydropower projects. We look to whether the WRCB's retention of jurisdiction over the flow rates conflicts with the FPA.

### II. *Statutory Interpretation*

Before considering case law and legislative history, a court reviewing a statutory construction must turn to the statute itself. *Touche Ross and Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed. 2d 82 (1979). Examining a statute's meaning entails looking at the statute as a whole, not at individual sections in a vacuum. *See Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 108 S.Ct. 1255, 1259, 99 L.Ed. 2d 460 (1988); *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 401, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987).

Although not dispositive of the preemption issue, the statute read in its entirety strongly suggests that Congress intended the FPA to vest final authority for the regulation of hydroelectric power projects in federal hands. The following sections illustrate Congress' general intent to

preempt the hydropower field to the exclusion of state controls: Section 4(e), 16 U.S.C. § 797(e) (Supp. V 1987) ("The Commission is authorized and empowered—To issue licenses ... for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, [and] powerhouses ... for the development, transmission, and utilization of power ... in any of the streams or other bodies of water over which Congress has jurisdiction...."); Section 10(a), 16 U.S.C. § 803(a)(1) (Supp. V.1987) ("All licenses issued ... shall be on the following conditions: That the project ... shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan ... for the improvement and utilization of water-power development ... [and] if necessary ... to secure such plan the Commission shall have authority to require the modification of any project...."); and Section 7(a), 16 U.S.C. § 800(a) (Supp. V.1987) ("In issuing preliminary permits ... or original licenses ... the Commission may give preference to the applicant the plans of which it finds and determines are best adapted to develop, conserve, and utilize in the public interest the water resources of the region."). To execute this general planning power, Congress gave FERC specific powers under the FPA to issue preliminary permits (§§ 4(f) and 5, 16 U.S.C. §§ 797(f) and 798 (1982)); investigate power development resources (§ 4(g), 16 U.S.C. § 797(g) (1982)); mandate prompt construction schedules in the license's terms (§ 13, 16 U.S.C. § 806 (1982)); grant licenses for a limited term of fifty years (§ 6, 16 U.S.C. § 799 (1982)), after which the Commission may take over the project on behalf of the United States on payment of just compensation (§ 14(a), 16 U.S.C. § 807(a) (1982)); to control the precise terms of the license (§ 6, 16 U.S.C. § 799 (1982)); and to award powers of eminent domain to licensees (§ 21, 16 U.S.C. § 814 (1982)). The weight of the comprehensive planning authority and the individual powers assigned to support that authority falls quite heavily on the side of federal exclusivity.

The language of one FPA provision, however, forestalls reaching with certainty the conclusion that the FPA manifests a clear congressional intent to preempt state regulations in every aspect of the hydropower domain. Section 27, codified at 16 U.S.C. § 821 (1982), states that "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein." The difficulty with section 27 arises from the fact that its language can support two conflicting readings. One reading would construe the section to limit state authority to the area of property rights involving water for irrigation, municipal use, and related activities. Under this reading, any aspect of operating a hydropower project not implicating these rights would fall under exclusive federal regulation. A second reading would construe the section much more broadly as an anti-preemption clause that gives the states final authority over all issues connected to the control and use of water by a project licensed under the FPA. This interpretation would support the idea that the states, not the federal government, have the last word over matters such as minimum flow rates. Since the provision's plain meaning is somewhat ambiguous, resolution of the preemption issue requires a turn to sources outside the statute.

### III. *Case Law*

California would resolve section 27's ambiguity by drawing on the section's legislative history and the Supreme Court's holdings in *California v. United States*, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). Because Supreme Court case law settles the preemption issue, California's legislative history argument does not require extensive discussion.

California draws heavily on the *California v. United States* opinion. In that case, the Supreme Court interpreted section 8 of the Reclamation Act of 1902, whose language is virtually identical to that in the FPA's section 27, to mean that the states

may impose any condition on a water rights permit that is not inconsistent with congressional directives authorizing the reclamation project in question.[2] More specifically, the court held that the "section does, of course, provide for the protection of vested water rights, but it also requires the Secretary [of the Interior] to comply with state law in the 'control, appropriation, use, or distribution of water.' ... The legislative history of the Reclamation Act of 1902 makes it abundantly clear that Congress intended to defer to the substance, as well as the form, of state water law." *California*, 438 U.S. at 675, 98 S.Ct. at 3001. This conclusion led the court to uphold WRCB permit conditions that required the United States to provide, among other things, a specific water use plan before acquiring the water. In the course of its opinion, the court expressly disavowed what it deemed to be *dicta* in other cases that had restricted section 8's savings scope to proprietary laws alone. *California*, 438 U.S. at 672–75, 98 S.Ct. at 2999–3001 (disapproving the interpretations of section 8 in *Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), and *City of Fresno v. California*, 372 U.S. 627, 83 S.Ct. 996, 10 L.Ed.2d 28 (1963)).

Since section 8 predates section 27, and apparently served as a drafting model for section 27, California argues that the *California* holding applies to section 27. This assertion leads California to conclude that its minimum flow requirements imposed on the Rock Creek project are therefore binding.

The difficulty California faces in making this argument is that other cases construing section 27, and its relation to section 8, have rejected California's reasoning. The leading case addressing section 27 is *First Iowa*, 328 U.S. 152, 66 S.Ct. 906. In *First Iowa*, the Supreme Court held that a provision of the FPA not at issue here, section 9(b), 16 U.S.C. § 802 (Supp. V.1987), did not require the Commission to withhold a project license until the project's sponsors complied with requirements for state permits under Iowa law. In reaching this conclusion, the Court found cause to construe the FPA as a whole in order to determine Congress' intent on the question of preemption. The Court reasoned that the FPA expresses Congress' intent to concentrate comprehensive hydropower planning authority in the Commission. Allowing states to impose requirements that hobbled this planning power struck the Court as tolerating "a veto power ... [that] would subordinate to the control of the State the 'comprehensive' planning which the Act provides shall depend on the judgment of the Federal Power Commission or other representatives of the Federal Government." *First Iowa*, 328 U.S. at 164, 66 S.Ct. at 911 (footnote omitted). This interpretation of the FPA led the Court to disapprove the argument, among others, that the proposed project must conform to a state statute dealing with the permit terms and conditions the state may impose to protect fish life. *Id.* at 165–66, 66 S.Ct. at 912–13.

In the course of construing the FPA as a whole, the Court offered an extensive commentary on section 27. The FPA, according to the Court, apportions authority over various aspects of hydropower regulation between the federal government and the states. *Id.* at 167, 171, 66 S.Ct. at 913, 915. This division of power means not that the state and federal government shall have final decision making powers over the same issue, *id.* at 167–68, 66 S.Ct. at 913–14, but rather that each entity shall have its own specific domain of control. Section 27, in the Court's reading of the FPA, describes the areas of control given to the states. The Court explicitly commented that the areas saved for state regulation are narrow in scope.

> The effect of § 27, in protecting state laws from supersedure, is limited to laws as to the control, appropriation, use or

---

**2.** Section 8, codified at 43 U.S.C. § 383 (1982), reads in relevant part, "Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws...."

distribution of water in irrigation or for municipal or other uses of the same nature. *It therefore has primary, if not exclusive, reference to such proprietary rights....* There is nothing in the paragraph to suggest a broader scope unless it be the words 'other uses.' Those words, however, are confined to rights of the same nature as those relating to the use of water in irrigation or for municipal purposes.

*Id.* at 175–76, 66 S.Ct. at 916–17 (emphasis added). This reading of section 27 and the FPA as a whole teaches that Congress intended federal law to preempt state regulation in all aspects of hydropower projects save for the limited proprietary exceptions specified in the section.[3]

California rejects *First Iowa* as controlling authority for three reasons. First, it claims that the Court's comments on section 27 constitute *dicta*. This argument is weak. As noted above, statutory construction entails looking at the statute as a totality, not in piecemeal fashion. Construing section 27 and other parts of the FPA was essential to the Court's pre-emption analysis of section 9(b). Dismissing *First Iowa*'s comments on section 27 as *dicta* is improper.

Second, California contends that *California v. United States* effectively overrules *First Iowa*'s interpretation of section 27, be it dicta or binding precedent. We find this argument unconvincing. The Supreme Court makes no reference to *First Iowa* in the *California* opinion. If the Court had intended to criticize or disapprove *First Iowa* it would have done so, just as it specifically disapproved the *dicta* of *Ivanhoe* and *City of Fresno*. A more reasonable interpretation of *First Iowa* and *California* is that they address two different and entirely separate water use programs. One federal court has held that the two cases do indeed address fundamentally different statutes. "In *California v. United States,* the Supreme Court dealt with a statute distinct in both purpose and history from that at issue in *First Iowa....* Notwithstanding similarity in wording of the statutes, they serve different objectives, and relate to federal actions fundamentally dissimilar in nature." *Town of Springfield, Vermont v. McCarren,* 549 F.Supp. 1134, 1154 (D.Vt.1982), *aff'd* 722 F.2d 728 (2d Cir.1983), *cert. denied,* 464 U.S. 942, 104 S.Ct. 360, 78 L.Ed.2d 322 (1983). We agree with this assessment. We conclude that *California*'s interpretation of the 1902 Reclamation Act does not affect *First Iowa*'s interpretation of the FPA. *First Iowa* continues to be cited by the Supreme Court and other federal courts as the authoritative interpretation of the FPA. *See, e.g., New England Power Co. v. New Hampshire,* 455 U.S. 331, 338 n. 6, 102 S.Ct. 1096, 1100 n. 6, 71 L.Ed.2d 188 (1982); *Town of Springfield, Vermont v. Vermont Environmental Bd.,* 521 F.Supp. 243, 248–250 (D.Vt.1981).

Finally, California argues that its flow requirements do not amount to a veto, in *First Iowa*'s use of the term, of the Rock Creek proposal. This argument is also unpersuasive. Changing the flow rates in such a significant fashion would directly affect the project's ability to run its turbines and generate electricity at the level stated in the FERC license and could jeopardize the economic feasability of the project. It would, in essence, create a different type of hydropower project from the one described in the license. In effect, this does constitute a veto of the project that was approved and licensed by FERC.

## IV. *Legislative History*

California devotes a considerable part of its brief to a review of section 27's legislative history in an attempt to show that Congress intended the section to be a broad anti-preemption provision. The Supreme Court, however, considered the section's legislative history in *First Iowa* and con-

---

**3.** We asked the parties to provide supplemental briefing on the issue of whether California's rights, if any, in Rock Creek's fish and fishery uses amounted to a proprietary right covered by section 27. Assuming, for purposes of argument only, that California has such rights, we conclude that they do not fall within *First Iowa's* narrow definition of the municipal and irrigation proprietary rights reserved for state control under section 27.

cluded that it supported a preemption reading. *First Iowa*, 328 U.S. at 176 n. 20, 66 S.Ct. at 917 n. 20. The Supreme Court's assessment of this legislative history is dispositive.

## CONCLUSION

Our reading of the FPA combined with the Supreme Court's teachings in *First Iowa* convince us that Congress intended to vest regulatory authority in FERC over most aspects of hydropower projects. Only control over certain limited proprietary rights remains in state hands. The WRCB's state law powers to impose conditions on water use in this case conflict with congressional purposes and objectives expressed in the FPA. The WRCB must yield, consequently, to FERC in this matter. We affirm the Commission's decision and its denial of rehearing.

AFFIRMED.