

Ferguson, Circuit Judge, filed a concurring opinion in which Schroeder and Alarcon, Circuit Judges, joined.

Nelson, Circuit Judge, concurred in part.

Goodwin, Circuit Judge, dissented and filed an opinion in which Wallace, J. Blaine Anderson, and Canby, Circuit Judges, concurred.

**Felicia GRUNFEDER,**
**Plaintiff, Appellant,**

v.

**Margaret HECKLER, Secretary of Health and Human Services, Defendant, Appellee.**

No. 82–5751.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted En Banc Sept. 13, 1984.

Decided Nov. 26, 1984.

**504**

Terry B. Friedman, Elyse S. Kline, Jana Zimmer, Josh A. Lazar, Bet Tzedek, Legal Services, Los Angeles, Cal., for plaintiff, appellant.

James R. Arnold, Asst. U.S. Atty., Los Angeles, Cal., Dennis J. Mulshine, Asst. Reg. Atty., San Francisco, Cal., Lois Waldman, New York City, for defendant, appellee.

Before GOODWIN, WALLACE, ANDERSON, SCHROEDER, PREGERSON, ALARCON, FERGUSON, NELSON, CANBY, BOOCHEVER, and REINHARDT, Circuit Judges.

PREGERSON, Circuit Judge:

## INTRODUCTION

We took this case en banc to decide the narrow question whether reparations payments that the German Federal Republic makes to survivors of the Holocaust constitute countable "income" in determining eligibility for supplemental security income (SSI) under the Social Security Act (the Act), 42 U.S.C. §§ 1381–1383c (1976 & Supp. IV 1980). Congress has not addressed this precise question. Neither the Act, its legislative history, nor its implementing regulations explicitly mention German reparations payments made pursuant to the Federal Law for the Compensation of Victims of National Socialist Persecution of June 28, 1956.[1] For the reasons stated below, we reverse the Social Security Administration's (SSA) determination that German reparations payments are income for the purpose of determining SSI eligibility.

## FACTS

Felicia Grunfeder, born a year before the Germans invaded Poland in World War II, was confined with her family in the Warsaw ghetto. She escaped in a coffin lifted over the fence separating the Jewish cemetery from the Polish cemetery. Grunfeder then lived with a Polish family in the Polish section of Warsaw until the Nazis imprisoned them in the Lager Rote-Rose concentration camp. Liberated by the Americans at the end of the war, Grunfeder was reunited with her mother. They both relocated to the United States in 1949. Grunfeder's father and the other members of her family perished at the hands of the Nazis.

Grunfeder developed severe psychological problems as a result of her experiences during the war. She petitioned the German government under the German Restitution Act and started receiving monthly reparations payments of 159 DM (approximately $228) in 1968. Because the psychological effects she suffers have been disabling, Grunfeder applied for and began receiving SSI payments of $119 in 1974. In 1980, the SSA learned that Grunfeder was receiving German reparations payments and terminated her SSI benefits on the ground that the reparations payments constituted "unearned income" under the Act and made her ineligible for SSI benefits.

The Secretary denied Grunfeder's motion for reconsideration, an administrative law judge denied her appeal, and the Appeals

---

1. Hereafter referred to as the "German Restitution Act."

The German Restitution Act grew out of postwar demands for reparations. Direct negotiations with Germany over the issue of reparations were conducted along two fronts: between Germany and Israel towards a lump sum settlement of Israel's claims, and between Germany and the Conference of Jewish Material Claims Against Germany for a resolution of individual claims.

After extensive negotiations, the government of Germany and the Conference on Jewish Material Claims signed a protocol on Sept. 10, 1952. The protocol set out principles for future legislation on reparations for individual claimants. The Federal Republic of Germany subsequently implemented these principles in the German Restitution Act. The statute provides for restitution for several types of claims, including the loss of property, possessions, and economic advancement, and injury to body and health.

Council denied her request for a review of the ALJ's decision. Exercising jurisdiction under 42 U.S.C. § 405(g) (1976 & Supp. IV 1980), the district court dismissed Grunfeder's complaint seeking review of the ALJ's decision. Grunfeder now appeals to this court.

## STANDARD OF REVIEW

Our court has "carefully examined [the question] when the receipt of an item of value by an SSI beneficiary constitutes income which is actually available to meet the beneficiary's basic needs." *Summy v. Schweiker*, 688 F.2d 1233, 1235 (9th Cir. 1982); *see Whaley v. Schweiker*, 663 F.2d 871, 873–75 (9th Cir.1981).

In *Whaley*, we overturned the determination of the Secretary of Health and Human Services that the amount of increased pension benefits the Veterans Administration pays a veteran for the support of his dependent children constitutes income in determining SSI eligibility. 663 F.2d at 875. We dismissed the Secretary's argument that because the veteran could use the dependent's portion for his own needs, that amount fell within the SSA's definition of income as "anything [an individual can use] to meet [his] basic needs for food, clothing, or shelter." 20 C.F.R. § 416.1102(a) (1981). In determining the proper accommodation between the Veterans Administration regulations and the SSI provisions, we noted that "[t]he interpretation of the Veterans Administration regulations by the Secretary of Health and Human Services, a department unrelated to the Veterans Administration,] is not entitled to deference." 663 F.2d at 873.

█ Likewise, the Secretary's interpretation of the German Restitution Act and the intended uses of reparations payments is entitled to little deference. Although we generally give some deference to an implementing agency's interpretation of a statute,

> where, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, '[t]he deference

owed ... cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.'

*NLRB v. Brown*, 380 U.S. 278, 292, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965) (quoting *American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)).

In determining that the definition of income for SSI eligibility purposes includes German reparations payments, the SSA implicitly balanced our Government's interest in allocating a limited pool of funds to support the country's aged, blind, and disabled against our Government's interest in restoring a semblance of normal existence to Holocaust survivors who live in the United States. This type of policy decision, which implicates foreign affairs, is outside the Secretary's expertise.

█ Congress has vested reviewing courts with the duty to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706 (1976). Courts are the final authority on questions of statutory construction, *Tulalip Tribes of Washington v. FERC*, 732 F.2d 1451, 1454 (9th Cir.1984), particularly in areas where, as here, the construction requires consideration of broad concerns beyond the agency's expertise. As we construe the Act's relevant SSI provisions, 42 U.S.C. §§ 1381–1383c, German reparations payments are not includable as income. Therefore, we find that the Secretary's contrary determination is "not in accordance with law," 5 U.S.C. § 706(2)(A), and we set it aside.

## DISCUSSION

The SSI program is designed to supplement the income of needy aged, blind, or disabled persons. *See* 42 U.S.C. § 1381 (1976). An individual is eligible for SSI benefits if his annual "income" is below $1,752 and his "resources" are less than $1,500. *Id.* § 1382(a)(1). Congress defines

"income" for SSI purposes in § 1382a as both "earned" and "unearned" income. Congress specifies that earned income means "only" wages, net earnings from self-employment, refunds of Federal income tax, and remuneration for services performed in a work activities center. *Id.* § 1382a(a)(1) (Supp. IV 1980). In contrast, Congress generally describes unearned income as "all other income," including seven categories of receipts. *Id.* § 1382a(a)(2) (A)–(F) (1976). Although Congress lists 12 types of receipts that "shall be excluded" from income, *id.* § 1382a(b) (1976 & Supp. IV 1980), Congress never defines the term "income" itself and leaves considerable flexibility in the statutory criteria for eligibility.

The SSA, however, has expansively defined "income" as "the receipt by an individual of any property ... which he can apply ... to meeting his basic needs for food, clothing, and shelter." 20 C.F.R. § 416.1102(a) (1980).[2] The SSA excludes only those receipts listed in other sections of the regulations. *See, e.g.,* 20 C.F.R. §§ 416.1105–416.1112, 416.1145–416.1175 (1980). On the basis of this administrative definition and the fact that German reparations payments are not specifically listed as an exclusion, the Secretary argues that reparations payments are countable income.

As stated earlier, Congress has not explicitly addressed the narrow question whether German reparations payments are income for the purposes of determining SSI eligibility. To ascertain Congress's intent on this question, we first look to the history of how Congress has treated Holocaust survivors. We then examine how Congress and the SSA have treated analogous payments. Finally, we employ the doctrine of

international comity to aid us in determining congressional intent.

### A. History: Congress and its Treatment of Holocaust Survivors

We first examine the question presented by this case, and the pertinent SSI provisions, in the light of federal policy according special consideration to victims of the Holocaust.

In 1948, Congress welcomed the Holocaust survivors to the United States by excluding them from immigration quota requirements. *See* Displaced Persons Act of 1948, 50 U.S.C.App. §§ 1951–1965 (1952), *amended by* 50 U.S.C.App. §§ 1951–1965 (1958), *omitted at* 50 U.S.C.App. §§ 1951–1965 (1976).

Even before Congress addressed the issue of taxing German reparations payments, the Internal Revenue Service (IRS) had consistently ruled that reparations payments did not constitute "income" because they "are in the nature of reimbursement for the deprivation of civil or personal rights." Rev.Rul. 58–500, 1958–2 C.B. 21; *see also* Rev.Rul. 56–518, 1956–2 C.B. 25 (using same language). Congress subsequently confirmed the IRS's assumption that Congress intended to exclude German reparations payments from taxable income because of their penitent purpose and restitutionary character. In 1954, the Senate ratified the Convention Between the Federal Republic of Germany and the United States of America for the Avoidance of Double Taxation with Respect to Taxes on Income, July 22, 1954, 5 U.S.T. 2768, T.I.A.S. No. 3133, and in 1965, ratified a protocol modifying the 1954 convention. The protocol exempted from income taxation the reparations payments made to Holocaust victims residing in the United States:[3]

---

**2.** The current regulations retain a need-based definition of "income." *See* 20 C.F.R. § 416.1102 (1984) ("[i]ncome" is anything [one] receive[s] in cash or in kind that [one] can use to meet [one's] needs for food, clothing, or shelter").

**3.** Immediately after World War II, the temporary martial government existing in Germany administered Military Law No. 59 (approved Nov. 10, 1947). With regard to property confiscated from the victims during the war, Article 91 provided that "[t]axes and other public levies shall not be imposed in connection with restitution."

Pensions, annuities and other amounts paid by one of the contracting States or by a juridical person organized under the public laws of that State as compensation for an injury or damage sustained as a result of hostilities or political persecution shall be exempt from tax by the other State.

Protocol Modifying the Convention Between the Federal Republic of Germany and the United States of America for the Avoidance of Double Taxation with Respect to Taxes on Income and to Certain Other Taxes, Sept. 7, 1965, art. XI(1)(c), 18 U.S.T. 1875, 1884, T.I.A.S. No. 5920.

Moreover, in 1978, the House and Senate passed a joint resolution designating April 28 and 29, 1979, as "Days of Remembrance of Victims of the Holocaust," in recognition of the fact that "on April 28 and 29 of 1945 the Armed Forces of the United States liberated the surviving victims of Nazi internment in the concentration camp in Dachau, Germany, and revealed to the world evidence of a tragic human holocaust that must never be forgotten." H.R.J.Res. 1014, 95th Cong., 2d Sess., 124 Cong.Rec. 26725, *enacted but not codified*, 92 Stat. 628 (1978).

Two years later, Congress ensured that Americans would remember the Holocaust by establishing the United States Holocaust Memorial Council. 36 U.S.C. §§ 1401–1408 (1982) (enacted Oct. 7, 1980). The Council's functions include providing for "appropriate ways for the Nation to commemorate the Days of Remembrance, as an annual, national, civic commemoration of the holocaust," and constructing "a permanent living memorial museum to the victims of the holocaust." *Id.* § 1401. The accompanying House Report states:

> The holocaust has been recognized as the systematic act of extermination of nearly 6 million Jews in Europe before and during World War II. During this same period millions of people suffered death and destruction at the hands of those who embraced the Nazi philosophy. The records of history fail to provide evidence of another act of genocide of

this, or even approaching this, magnitude.

> The armies of the United States were the primary discoverers of the locations used for extermination, the records of the systematic genocide and the few survivors. Of those few survivors of the holocaust, many subsequently emigrated to the United States and they and their descendents now form an integral part of our society. The historic perspective of the nation has been clearly affected by this event in such a way that historians generally recognize the holocaust as an occurrence of the history of the United States.

H.R.Rep. No. 1347, 96th Cong., 2d Sess. 4, *reprinted in* 1980 U.S.Code Cong. & Ad. News 3343, 3344.

Congress has thus acknowledged that unprecedented atrocities were committed during the Holocaust, accepted the surviving victims as members of our society, and accorded special recognition to the German government's reparations payments by excluding them from Federal income tax. Therefore, even though Congress has not spoken explicitly on the issue whether German reparations payments are to be excluded from income for SSI eligibility purposes, Congress's reaction to the Holocaust and its recognition of the restitutionary nature of the reparations payments indicate an intent to exclude those payments from countable income for SSI purposes.

### B. *How Congress and the SSA Have Treated Analogous Receipts*

In at least one analogous situation, Congress has explicitly excluded reparations payments from the computation of income for SSI purposes. In the Blackfeet and Gros Ventre Tribes of Montana Judgment Funds Distribution Act, 25 U.S.C. §§ 1261–1265 (1976), Congress provides that payments the United States Government makes to two Native American tribes are excluded from income for both federal income tax and SSI eligibility purposes. *Id.* § 1264. As Senator Ribicoff observed, the SSI exclusion for these payments "follows congressional intent to rectify past injus-

tice perpetrated against the American Indian." 118 Cong.Rec. 4027 (1972). Similarly, Holocaust survivors receive reparations payments to make amends for past injustices and horrors perpetrated against them by the Nazis. These payments are not designed to support basic needs, but to assuage psychological wounds that will never heal. The fact that the Blackfeet and Gros Ventre payments are not included in the SSI list of exclusions from income, *see* 42 U.S.C. § 1382a(b) (1976), indicates that the list is not exclusive and that Congress may have intended to exclude similar receipts not specified in the list.

Moreover, the SSA in effect concedes this interpretation. It excludes from income federal reparations payments to Alaskan Native Americans even though Congress has not explicitly provided for their exclusion in either the Act or the legislation establishing the payments. *See* Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1628 (1976 & Supp. IV 1980). Congress specifically provides that the Alaskan payments are exempt from income taxation, *id.* § 1620(a) (1976), but does not mention whether they are also excluded from income for SSI purposes. Apparently treating the income tax exemption as an indication of congressional intent, the SSA excluded the Alaskan native payments from income for SSI purposes "to the same extent that those payments are exempt from taxation by reason of [the Alaska Native Claims Settlement Act]." 20 C.F.R. § 416.1146(1) (1980).[4]

The SSA's willingness to exclude the Alaskan native payments despite congressional silence undermines the Secretary's argument that German reparations payments are non-excludable unless Congress has expressly provided otherwise. The inconsistency in this position is even more pronounced when we focus on the basis for excluding the Alaskan payments—the income tax exemption—which is equally applicable to the German reparations payments.

As the Supreme Court observed in *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), "the weight of an administrative interpretation will depend, among other things, upon 'its consistency with earlier and later pronouncements' of an agency." *Id.* at 237, 94 S.Ct. at 1075 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)). The exclusion of Blackfeet, Gros Ventre, and Alaskan Native payments, when considered in light of congressional concern for the victims of the Holocaust, provides us with a solid basis for finding German reparations payments excludable in determining eligibility for SSI benefits and for setting aside the Secretary's anomalous interpretation.

In an effort to minimize the importance of these analogous examples, the Secretary cites two other types of benefits that Congress does include as income for SSI purposes: workers' compensation and veterans' compensation payments. *See* 42 U.S.C. § 1382a(a)(2)(B) (1976). Here, the analogy is inapposite. Unlike German reparations, workers' compensation payments arise from a commercial employee-employer relationship. They are essentially a substitution for loss of earnings, not compensation for an injustice committed upon the employee. Indeed, workers' compensation is paid without regard to fault; the premiums imposed on the employer fund insurance against workplace injury.

The inclusion of veterans' compensation payments is noninstructive for similar reasons. Veterans' payments do not embody an admission of fault or expression of penitence for deprivation of personal rights. The absence of a penitent purpose thus distinguishes both types of payments from the German reparations payments.

In short, because both Congress and the SSA have excluded analogous reparations payments from income in determining SSI eligibility, and because workers' compensation and veterans' compensation payments

---

**4.** The Administration has dropped the income tax qualification in its most recent regulation on point, and now excludes all of the Alaskan native payments from income for SSI purposes regardless of their taxability. 20 C.F.R. § 416.1124(b), app. IV(a) (1984).

are distinguishable, it is reasonable to conclude that Congress intended to exclude German reparations payments.

## C. *The Role of International Comity*

■ The doctrine of international comity gives us another reason for concluding that Congress intended to exclude German reparations payments from income for SSI purposes. Absent an expression of congressional intent to the contrary, considerations of courtesy and mutuality require our courts to construe domestic legislation in a way that minimizes interference with the purpose or effect of foreign law. *See, e.g., Lauritzen v. Larsen,* 345 U.S. 571, 576–78, 592–93, 73 S.Ct. 921, 925–26, 933–34, 97 L.Ed. 1254 (1953) (term "[a]ny seaman" in Jones Act held not to include Danish sailor with regard to events on Danish ship outside U.S. waters); *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949) (term "[e]very contract" in Eight Hour Law held not to include a contract between the U.S. and a private contractor for work in a foreign country). This principle of statutory construction, "a valid approach whereby unexpressed congressional intent may be ascertained," is "based on the assumption that Congress is primarily concerned with domestic conditions." *Foley,* 336 U.S. at 285, 69 S.Ct. at 577.

There are two reasons why we think the principles of comity support setting aside the SSA's determination that German reparations payments are countable income.

First, including German reparations payments as income for the purpose of determining SSI eligibility would frustrate the German Restitution Act's penitent and restitutionary purposes. Depriving Grunfeder of SSI benefits would force her to spend the reparations payments on basic necessities and leave her with no restitution for the suffering she endures as a result of the Holocaust. Unlike the SSI payments, which are designed to provide basic necessities, the German payments are designed to make the recipients whole. Excluding Blackfeet and Gros Ventre payments from income for SSI eligibility demonstrates

Congress's acknowledgment that inclusion would frustrate the payments' restitutionary purpose. And the SSA's exclusion of the Alaskan native payments can only be explained as an attempt to effectuate congressional intent to provide for reparation. If exclusion is necessary to effectuate the purposes of the Blackfeet, Gros Ventre, and Alaskan native payments, it follows that exclusion is also necessary to avoid frustrating the purpose of the German reparations payments.

Second, Congress has expressed no desire to interfere with the German government's attempt to make amends for crimes committed during the Holocaust. Instead, Congress has established a Memorial Council to commemorate Days of Remembrance and to erect a permanent living museum on behalf of the victims. Moreover, Congress has agreed not to subject the German reparations payments to Federal income taxation. We think that these congressional actions reflect a desire to effectuate fully the German government's restitutionary intent in making reparations payments. For these reasons, the doctrine of comity supports interpretation of the SSI provisions to exclude German reparations payments from income in determining SSI eligibility.

## CONCLUSION

In sum, even though Congress has not spoken directly on the matter, we conclude that Congress's historical concern for Holocaust victims and Congress's and the SSA's treatment of analogous payments, when considered in conjunction with principles of international comity, indicate a congressional intent to exclude German reparations payments from income in determining SSI eligibility.

This case requires us to resolve a conflict between the Government's interest in allocating a limited pool of funds to support the country's aged, blind, and disabled, and the Government's interest in restoring a semblance of normal existence to Holocaust survivors who are part of our society. In resolving the matter in favor of the latter, we follow the lead of Congress.

Having recognized the great suffering of people like Felicia Grunfeder, and having consistently taken steps to ameliorate their plight, Congress could not have intended to undermine its own longstanding policy favoring their welfare by counting German reparations payments as income in determining eligibility for SSI benefits.

Today's decision is in harmony with Congress's desire to provide some solace to the victims of one of human history's terrible tragedies.

The district court's judgment is VACATED and REMANDED for further proceedings consistent with this opinion.

SCHROEDER, ALARCON, FERGUSON, BOOCHEVER and REINHARDT, Circuit Judges, concurring.

NELSON, Circuit Judge, concurring with the exception of Section C.

FERGUSON, Circuit Judge, concurring; SCHROEDER and ALARCON, Circuit Judges, joining.

Although concurring in the court's well reasoned opinion, I arrive at the same result by analyzing the issue in a different manner. This analysis does not depend on the status of the recipient but instead rests on the status of the funds received. Tort compensation traditionally has been excluded from the definition of income and, unless Congress specifically states otherwise, the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–1383c, should not be construed as modifying this longstanding definition. Because the reparations payments at issue here are in the nature of tort compensation, Rev.Rul. 57–505, 1957–2 C.B. 50 (such payments are "in the nature of reimbursement for the deprivation of civil or personal rights"); Rev.Rul. 56–518, 1956–2 C.B. 25 (German reparation payments are paid on account of "suffered damage to life, body, health, liberty, rights of property ownership, or to professional or economic advancement"), they neither constitute "income" under the income tax laws, Rev.Rul. 71–477, 1971–2 C.B. 479; Rev.Rul. 58–500, 1958–2 C.B. 21; Rev.Rul.

57–505, 1957–2 C.B. 50; Rev.Rul. 56–518, 1956–2 C.B. 25, nor under the Act for purposes of determining eligibility for supplementary security income ("SSI").

Despite the broad definition accorded to the term "gross income" under the tax laws, *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 429–32, 75 S.Ct. 473, 475–77, 99 L.Ed. 483 (1955); I.R.C. § 61(a), payments received in the nature of tort compensation have never been considered income. *See Commissioner v. Glenshaw Glass Co.*, 348 U.S. at 432 n. 8, 75 S.Ct. at 477 n. 8; *Roemer v. Commissioner*, 716 F.2d 693, 696 (9th Cir.1983). Congress has explicitly excluded personal injury recoveries from the definition of income since 1918. Revenue Act of 1918, Ch. 18, § 213(b)(2), 40 Stat. 1057 (1919). Today such recoveries are excluded from income under section 104(a)(2) of the Internal Revenue Code. 26 U.S.C. § 104(a)(2).

To be eligible for SSI benefits under the Act, an individual must be aged, blind, or disabled with an income not exceeding a meager $1,752 per year and resources no greater than $1,500 (unmarried) or $2,250 (married). 42 U.S.C. § 1382(a)(1). An individual's annual income consists of both his or her earned and unearned income as defined in section 1382a of the Act. 42 U.S.C. § 1382a. In section 1382a(2), Congress defines "unearned income" as all income other than earned income and sets forth a nonexhaustive list of specific items constituting unearned income. Tort compensation is not included in that list. When it omitted such compensation from the list, Congress did so with the knowledge that historically personal injury recoveries have always been excluded from the definition of income. Had Congress wished to alter this longstanding definition it would have so stated. *See* 2A C.D. Sands, Statutes and Statutory Construction § 47.30 (1973) (legislature is presumed to have given legal terms in a statute the same meaning as that given to them in the jurisprudence of this country absent a manifested intent to the contrary). This is further underscored by the fact that Congress deemed it neces-

sary to expressly list items such as gifts, inheritances, prizes and awards, workmen's compensation payments, and life insurance proceeds which are either fully or partially excluded from income under the income tax laws, so that, contrary to the usual tax treatment, the entire amount of such items would be included in the calculation of income for SSI purposes. 42 U.S.C. § 1382a(2)(A), (B), (C), (D), (E), (F). This explicit inclusion of items exempted or partially exempted from income under the income tax laws evidences Congress' intention not to include tort damages within the definition of income for purposes of SSI eligibility.

The rationale underlying the exclusion of compensation paid for personal injuries from gross income under the income tax laws, 26 U.S.C. § 104(a)(2), is that such compensation makes the victim "whole from a previous loss of personal rights— because, in effect, [it] restore[s] a loss to capital." *Starrels v. Commissioner*, 304 F.2d 574, 576 (9th Cir.1962). *See also Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 432 n. 8, 75 S.Ct. 473, 477 n. 8, 99 L.Ed. 483 (1955) (referring to the long history of Internal Revenue Service rulings holding personal injury recoveries nontaxable on the theory that they correspond to a return of capital); *Roemer v. Commissioner*, 716 F.2d 693 (9th Cir.1983) (entire lump-sum recovery of damages in a defamation action is excludable from gross income as damages received "on account of personal injuries" and the award should not be differentiated as includable or excludable on the basis of whether the amount recovered was in consideration of damage to plaintiff's personal life or his professional career). This understanding has led the Commissioner of Internal Revenue to interpret liberally the statute excluding such recoveries from income so as to include both punitive damages and all compensatory damages (whether for pain and suffering or loss of employment) where there has been a personal injury. Rev.Rul. 75–45, 1975–1 C.B. 47. *See also Roemer v. Commissioner*, 716 F.2d at 700. This same rationale applies to the calculation of in-

come for determining eligibility for SSI. When money is received as compensation for wrongful loss there is no economic gain or accession to wealth but only an attempt to restore the recipient to the position he occupied prior to the loss. The recipient is perhaps made whole, but not enriched. *Starrels*, 304 F.2d at 576.

When determining whether a SSI applicant's income exceeds $1,752 the rationale discussed above with respect to tax laws requires exclusion of tort compensation from this calculation. For example, the person with one arm and a tort recovery for the loss of his other arm is no better off than he was with two arms and no tort recovery. *See Starrels v. Commissioner*, 304 F.2d at 576; *Hawkins v. Commissioner*, 6 B.T.A. 1023, 1025 (1927) ("Such compensation ... adds nothing to the individual .... It is an attempt to make the plaintiff whole as before the injury.").

Even though the Secretary of the Department of Health and Human Services (the "Secretary") defines "income" as "anything you receive in cash or in kind that you can use to meet your needs for food, clothing, or shelter," 20 C.F.R. § 416.-1102, the Secretary has not treated "income" as including all monetary receipts. The Secretary has excluded payments made for land claims under the Alaska Native Claims Act from the calculation of income for SSI purposes since 1974, despite the fact that Congress only expressly exempted such payments from income tax, 43 U.S.C. § 1620(a), and not from the definition of income for purposes of SSI eligibility. 1975 U.S.Code Cong. & Ad.News 2389. *See* 20 C.F.R. § 416.1124(b), App. IV(a) (regulations under the Act exempting such payments from income for SSI purposes). The purpose of the Alaska Native Claims Act is "to provide an equitable solution to the [land] claims made by the Natives of Alaska through a combination grant of land and money," 1971 U.S.Code Cong. & Ad.News 2193. When the Secretary excluded the benefits received by the Alaska Natives, she clearly understood the traditional rule that payments received in the

nature of tort compensation have never been considered income. The payments received by Mrs. Grunfeder in this case are of the same nature as those received by the Alaska Natives. The only difference is the status of the recipients. This underscores the reason why I would decide this case not on the status of the recipient but upon the status of the funds which are received.

Because the traditional exclusion of tort recoveries from the definition of "income" continues under the Act, payments received in the nature of tort compensation, such as the ones involved here, are to be disregarded in calculating an individual's income for purposes of determining eligibility for SSI. Basing our decision on this analysis would also exclude from the definition of income for SSI purposes payments such as those received by former prisoners of war and internees under the War Claims Act of 1948, 50 U.S.C.App. §§ 2001–2017; see Rev.Rul. 56–462, 1956–2 C.B. 20 (payments to former prisoners of war captured and held during the hostilities in Korea as compensation for the loss of their personal rights are not includable in the gross income of the recipients for federal income tax purposes); Rev.Rul. 55–132, 1955–1 C.B. 213 (payments authorized by War Claims Act to former prisoners of war are in the nature of reimbursement for loss of personal rights and are not includable in the gross income of the recipient); those made to victims of criminal acts as restitution for the pecuniary losses they suffer as a direct result of those acts, see Cal.Gov't Code §§ 13959–13974; and any payments made to satisfy the claims of those who suffered hardship as a result of Executive Order 9066, 7 Fed.Reg. 1407 (Feb. 19, 1942), which caused the relocation and internment of persons of Japanese ancestry as well as citizens of the Aleutian and Pribilof Islands. See American-Japanese Evacuation Claims Act, 50 U.S.C.App. §§ 1981–87; Japanese American Evacuation Redress, 1983: Hearings on S.1520 Before the Subcomm. on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 98th Cong., 1st Sess. (1983); Commission on Wartime Relocation and Internment of Civilians, Personal Justice Denied (1982); 1980 U.S. Code Cong. & Ad.News 2405–06.

The definition of income does not depend on the status of the recipient but on the nature of the payment received. Tort compensation has traditionally been excluded from the definition of income and, unless Congress specifically states otherwise, the Act should not be construed as modifying this longstanding definition. Thus, because tort recoveries are not "income," the reparation payments at issue here, which are in the nature of tort compensation, are not "income" for the purposes of determining eligibility for SSI.

GOODWIN, Circuit Judge, dissenting; WALLACE, J. BLAINE ANDERSON and CANBY, Circuit Judges, joining:

The majority's exposition of what the Congress might have intended if the question had been before it is probably as accurate as that sort of speculation ever can be. The original panel that decided this case, however, was dealing with the law as it was, and not as it might have been had the Congress been better advised. I would not have taken the case en banc, and would adhere to the original panel decision. See Grunfeder v. Heckler, 708 F.2d 458 (9th Cir.1983).

The SSI program is a need-based program. An individual is eligible for SSI benefits if that person's income and resources fall below certain statutory figures. Grunfeder's resources do not fall below those figures. Having recognized these considerations, the majority looks to a number of statutes in which Congress did express an intent that certain benefits not be counted as unearned income to decide that Congress intended sub silentio the same result here. The original panel took the same statutory examples to reveal that Congress knows how to make policy exceptions of this kind when it chooses to do so. Much of what the majority has to say about the equities in this case can hardly be disputed. Indeed, Congress would no doubt lend a willing ear.

The analogies which the majority draws to lump sum awards, however, do not apply to a need-based statutory scheme of the kind presently before us. While not mentioned by the majority, Grunfeder received the various lump sum awards to which she was entitled, and they have not been counted against her. I believe the original panel made the correct analysis of the law to apply to this case for the reasons carefully stated in its opinion. The tragic history of Germany between 1935 and 1945 sheds no light on the narrow question before us.

I respectfully dissent.