**INDEPENDENT UNION OF FLIGHT ATTENDANTS, Plaintiff–Appellant,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., and Pan American Corporation, Defendants–Appellees.**

**No. 89–15577.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 1990.

Decided Jan. 10, 1991.

Peter O. Shinevar, Bredhoff & Kaiser, Wash., D.C., for plaintiff-appellant.

Gilmore F. Dickmann, Jr., Bronson, Bronson & McKinnon, San Francisco, Cal., for defendants-appellees.

Before D.W. NELSON and TROTT, Circuit Judges, and TASHIMA,* District Judge.

TASHIMA, District Judge:

Appellant (plaintiff) Independent Union of Flight Attendants (IUFA) brought this action to enforce an arbitration provision in its collective bargaining agreement (CBA) with appellees (defendants) Pan American World Airways, Inc. (Pan Am), and Pan Am Corporation. That agreement, effective June 4, 1986, provided that Pan Am would use IUFA flight attendants on the Pan Am Flight Service System Seniority List for all present or future flying. By a letter agreement, this scope clause was made equally applicable to the operations of the parent, Pan Am Corp. Pan Am has used IUFA flight attendants on intra-European routes for at least 13 years and has entered into other agreements under the Railway Labor Act (RLA) for such all-foreign routes with pilots and other flight attendants' unions.

In November 1987, Pan American Express, Inc., a subsidiary of Pan Am Corp., began offering intra-European service from a base in Berlin ("Berlin Express"). None of these flights take off from or land in, or overfly, any state, territory, or possession of the United States. Berlin Express chose to operate with foreign national flight attendants represented by a German union. On January 6, 1988, IUFA filed a grievance alleging that defendants' failure to use IUFA flight attendants constituted a violation of the scope clause of the CBA. Pan Am denied the grievance on February 9, 1988, on the ground that the issue was not one of contract interpretation but a representational dispute over which the arbitral body provided for in the contract has no jurisdiction.

On defendants' motion, the district court dismissed the action for lack of subject matter jurisdiction on the ground that the RLA does not apply extraterritorially. Plaintiff appealed[1] and we affirm.

## ISSUE

The sole issue on appeal is whether or not the district court had subject matter jurisdiction of this action.[2]

## DISCUSSION

Plaintiff seeks to establish subject matter jurisdiction on the ground that this action "arises under" the RLA. 45 U.S.C. §§ 151 *et seq.* & 181 *et seq.;* 28 U.S.C. §§ 1331 & 1337. Section 204 of the RLA, 45 U.S.C. § 184 (1982), requires contracting parties to establish system boards of adjustment to resolve "minor disputes"[3] through arbitration. An action arises under federal law if either: (1) a federal statute creates the claim; or (2) a substantial question of federal law is a necessary element of the claim. *E.g., Morongo Band of Mission Indians v. California State Bd. of Equalization,* 858 F.2d 1376, 1383 (9th Cir. 1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989).

Federal district courts have "arising under" jurisdiction to enforce such required arbitration provisions in contracts entered into under the RLA. *International Ass'n of Machinists v. Central Airlines,* 372 U.S. 682, 692, 83 S.Ct. 956, 962, 10 L.Ed.2d 67 (1963). Defendants argue, however, that their obligation to arbitrate this dispute cannot be enforced in federal court because

---

* Honorable A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation.

1. We have appellate jurisdiction of this appeal from the final judgment of dismissal under 28 U.S.C. § 1291.

2. Dismissal for lack of subject matter jurisdiction is a pure question of law reviewed *de novo.*

*E.g., McIntyre v. McIntyre,* 771 F.2d 1316, 1317 (9th Cir.1985).

3. IUFA's claim that this is a "minor dispute" under 45 U.S.C. § 184 is disputed by Pan Am. However, that is a question going to the merits which we do not reach.

the RLA does not extend to purely foreign flying. We first determine the scope of the RLA, and then consider whether the provision may be enforced in federal court.[1]

## A. The Territorial Scope of the RLA

### 1. *The presumption against extraterritoriality*

■ The RLA does not expressly encompass or exclude purely foreign flying. On the "assumption that Congress is primarily concerned with domestic conditions," *Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949), the Supreme Court has applied a presumption against extraterritoriality to federal statutes.

> The canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States, is a valid approach whereby unexpressed congressional intent may be ascertained.

*Id.; see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S.Ct. 683, 691, 102 L.Ed.2d 818 (1989) (limiting Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1603(c), "waters" to within 3–mile territorial sea); *Grunfeder v. Heckler*, 748 F.2d 503, 509 (9th Cir.1984) (en banc) (German reparation payments not intended to affect SSI eligibility); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 589 (9th Cir.1983) (limiting FSIA to territorial jurisdiction), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984). In *Foley Bros.*, the Court held that the "Eight Hour Act" did not apply extraterritorially, since "nothing in the Act itself.... nor in the legislative history ... [led] to the belief that Congress entertained any intention other than the normal one." 336 U.S. at 285, 69 S.Ct. at 577.

This presumption has been attributed to the risk of "outright collisions between domestic and foreign law" which are "a po-

---

**4.** Plaintiff argues that the district court erred in analyzing the question of extraterritoriality as one of subject matter jurisdiction, rather than as one going to the merits of its claim. Had the district court reached the merits, it could then have considered plaintiff's contention that judicial estoppel precludes defendants from resisting arbitration. *See Rockwell Int'l Corp. v. Hanford Atomic Metal Trades Council*, 851 F.2d 1208 (9th Cir.1988). We agree with the district court. " 'Jurisdictional dismissals in cases premised on federal-question jurisdiction are exceptional, and must satisfy the requirements specified in *Bell v. Hood.*' " *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir.1987). "Under *Bell v. Hood,* 327 U.S. 678, 681, 66 S.Ct. 773, 775, 90 L.Ed. 939 (1946), jurisdiction exists if the complaint is 'drawn so as to claim a right to recover under the Constitution and laws of the United States.' " *Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union*, 457 U.S. 15, 21 n. 6, 102 S.Ct. 2202, 2206 n. 6, 72 L.Ed.2d 639 (1982); *Roberts*, 812 F.2d at 1177 (articulating exceptions). This court has held that dismissal for failure to come within a statute's definitional reach is a decision on the merits rather than on an absence of jurisdiction. *See Ferguson v. Greater Pocatello Chamber of Commerce*, 848 F.2d 976, 979–80 (9th Cir.1988) (Sherman Act's "interstate commerce" element); *Sun Valley Gasoline v. Ernst Enter., Inc.*, 711 F.2d 138, 140 (9th Cir.1983) (Petroleum Marketing Practices Act); *Black v. Payne*, 591 F.2d 83, 86 n. 1 (9th Cir.) (definition of "security" under federal securities law), *cert. denied*, 444 U.S. 867, 100 S.Ct. 139, 62 L.Ed.2d 90 (1979).

We need not reexamine the scope of *Bell v. Hood* in this case. *Cf. Rodriguez v. Flota Mercante Grancolumbiana*, 703 F.2d 1069, 1072 (9th Cir.) (failure to establish that defendant is a Jones Act "employer" is jurisdictional defect; *Bell v. Hood* applies only to facial challenge to pleadings), *cert. denied*, 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 94 (1983). We have consistently treated the question of whether a federal statute applies extraterritorially as a jurisdictional one. *See, e.g., McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 813–15 (9th Cir.1988) (antitrust laws); *Republic of the Phil. v. Marcos*, 818 F.2d 1473, 1478 (9th Cir.1987) (alleged RICO violations), *rev'd en banc on other grounds*, 862 F.2d 1355 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989); *Timberlane Lumber Co. v. Bank of America,* 749 F.2d 1378, 1386 (9th Cir.1984) (affirming dismissal of antitrust action for lack of subject matter jurisdiction), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985); *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 421–22 (9th Cir.1983) (federal securities laws); *Cheng v. Boeing Co.*, 708 F.2d 1406, 1412 (9th Cir.) (Federal Aviation Act), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983); *Des Brisay v. Goldfield Corp.*, 549 F.2d 133, 136 (9th Cir.1977) ("Where the question is one of the extraterritorial application of United States securities laws, 'the issue of subject matter jurisdiction persists.' "). Plaintiff has neither cited authority nor made any compelling argument to justify departing from this consistent treatment of the issue of extraterritoriality as jurisdictional.

tential source of friction between the United States and foreign countries...." *Pfeiffer v. Wm. Wrigley Jr. Co.*, 755 F.2d 554, 557 (7th Cir.1985) (denying extraterritorial effect to the Age Discrimination in Employment Act [ADEA]).[5] It has also been attributed to the deference of courts to Congress. "It alone has the facilities necessary to make fairly such an important policy decision...." *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957) (denying extraterritorial effect to the NLRA).

This presumption creates a high threshold. In *Benz*, the Court considered whether the striking crew of a foreign vessel could invoke the protection of the Labor Management Relations Act (LMRA) while in United States waters. In denying extraterritorial effect to the Act, the Court held that "to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed." *Id.; see also McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963) (absent affirmative congressional intent, court cannot exercise jurisdiction despite preponderance of contacts with United States).[6] In *Foley Bros.*, the Court rea-

---

**5.** The dissent disagrees with the suggestion from *Pfeiffer* "that an American exercise of jurisdiction would clash with another state's jurisdictional assertion." Relying on maritime cases, the dissent argues that "regulation by Germany of the labor relations of a foreign carrier might well be unreasonable."

Under Restatement (Third) of Foreign Relations Law, § 402(1)(a) & (b), a state has jurisdiction to prescribe law with respect to "conduct that, wholly or in substantial part, takes place within its territory," and "the status of persons or interests in things, present within its territory." Of course, the exercise of such jurisdiction must not be unreasonable. *Id.* §§ 402, 403. Under the Restatement's view, the exercise of jurisdiction by Germany in this case—which involves regularly scheduled intra-European flights (some wholly within Germany), operating out of a Berlin hub, with foreign national flight attendants who are represented by Gerwerkschaft Offentlich Dienste—Transport und Verkehr, a German labor union—would almost certainly not be unreasonable. *See id.* § 403, Reporter's Note 4 (1986).

In accordance with the Restatement's principles, this country has exercised jurisdiction over foreign air carriers operating within this country. For example, in *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C.Cir.1984), the court held that alleged anticompetitive conduct by foreign air carriers on trans-Atlantic routes was subject to the jurisdiction of the Sherman Act. *Id.* at 925–26 & 956 (dissent's agreement that "the jurisdictional basis for Laker's action in the United States District Court is firmly established under settled principles of United States and international law"). The interest of the United States in applying its law to foreign carriers operating in this country, articulated in *Laker*, is the same interest of Germany in applying its law to Berlin Express:

[T]he United States has a substantial interest in regulating the conduct of business within the United States. The landing rights granted to appellants are permits to do business in this country. Foreign airlines fly in the United States on the prerequisite of obeying United States law. They have offices and employees within the United States, and conduct substantial operations here. By engaging in this commercial business they subject themselves to the in personam jurisdiction of the host country's courts. They waive either expressly or implicitly other objections that might otherwise be raised in defense.

*Id.* at 924–25 (footnotes omitted).

The Restatement also expressly recognizes that a state may apply its law to "foreign vessels or aircraft in its territorial waters or ports or airspace." Restatement § 402, Comment *h.* As noted in footnote 6, *infra*, under this principle, according to the Supreme Court "if Congress had so chosen, it could have made the [Labor Management Relations] Act applicable to wage disputes arising on foreign vessels between nationals of other countries when the vessel comes within our territorial waters." *Benz*, 353 U.S. at 142, 77 S.Ct. at 701.

Applying these principles to the case at bench, we respectfully disagree with the dissent's conclusion that "regulation by Germany of the labor relations of a foreign carrier [in the circumstances here] might well be unreasonable."

**6.** "[A] merchant ship 'is deemed to be a part of the territory of that sovereignty [whose flag it flies], and not to lose that character when in navigable water within the territorial limits of another sovereignty.'" *Lauritzen v. Larsen*, 345 U.S. 571, 585, 73 S.Ct. 921, 929, 97 L.Ed. 1254 (1953) (brackets in the original). By virtue of concurrent "territorial" jurisdiction, Congress could have applied the LMRA to such ships, *Benz*, 353 U.S. at 142, 77 S.Ct. at 701, although in general "the law of the flag supersedes the territorial principle." *Lauritzen*, 345 U.S. at 585, 73 S.Ct. at 929. The foreign flag vessel is thus an analogue to the territory of a foreign

soned that Congress would not ordinarily apply domestic wage and hour provisions to aliens working abroad on United States public works projects and that the absence of a distinction in the Act between citizens and aliens was strong evidence of congressional intent not to do so. 336 U.S. at 286, 69 S.Ct. at 578. "An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose." *Id.*

Most courts of appeals have consistently required such a "clear expression" of congressional intent to apply legislation extraterritorially. *E.g., CFTC v. Nahas,* 738 F.2d 487, 493 n. 12 (D.C.Cir.1984) (clear evidence or unambiguous expression lacking; service of process statute not applied extraterritorially); *Cleary v. United States Lines, Inc.,* 728 F.2d 607, 610 (3d Cir.1984) (affirmative evidence lacking; ADEA not applied extraterritorially); *United States v. Mitchell,* 553 F.2d 996, 1002 (5th Cir.1977) (denying extraterritorial effect to the Marine Mammal Protection Act). The Fifth Circuit applied this heightened standard in concluding that Congress did not intend extraterritorial application of Title VII of the Civil Rights Act of 1964. *Boureslan v. ARAMCO,* 857 F.2d 1014 (5th Cir.1988), *aff'd en banc,* 892 F.2d 1271 (5th Cir.1989), *cert. granted,* — U.S. —, 111 S.Ct. 40, 112 L.Ed.2d 17 (1990).

### 2. *Interpretation of the RLA*

■ The RLA does not expressly except purely foreign flying from its coverage.

Nonetheless, virtually every court to consider the question has concluded that Congress did not intend the RLA to govern labor disputes in other countries. *E.g., Air Line Dispatchers Ass'n v. National Mediation Bd.,* 189 F.2d 685, 690–91 (D.C.Cir.) (union applied to NMB to resolve representation dispute involving foreign dispatchers), *cert. denied,* 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); *Air Line Stewards & Stewardesses Ass'n v. Northwest Airlines,* 267 F.2d 170 (8th Cir.) (union sued to overturn arbitration award precluding union representation of foreign national flight attendants on foreign flights), *cert. denied,* 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959); *Air Line Stewards & Stewardesses Ass'n v. Trans World Airlines,* 273 F.2d 69 (2d Cir.1959) (per curiam) (action to compel TWA to bargain with union on behalf of foreign flight attendants on foreign flights), *cert. denied,* 362 U.S. 988, 80 S.Ct. 1075, 4 L.Ed.2d 1021 (1960). None of these cases, however, concerned an attempt to enforce an agreement already entered into by the parties.[7]

Our starting point in analyzing the scope of the RLA is its definition of "commerce." The RLA was amended to cover common carriers by air in 1936. Act of April 10, 1936, ch. 166, 49 Stat. 1189 (codified at 45 U.S.C. §§ 181, *et seq.*). Except for the omission of a national board of adjustment, Congress simply "extended to ... every common carrier by air engaged in interstate or foreign commerce" those provisions relating to carriers by rail. 45 U.S.C. § 181 (1982) (referring to 45 U.S.C. §§ 151–163). At the time of the amendment, a

---

nation, into which United States labor law ordinarily should not project.

Conversely, aircraft flying the flag of the United States have United States nationality. *See* Restatement (Third) of Foreign Relations Law § 501, Reporter's Note 10 (1986). However, it should be noted that the principles which govern international aviation are not identical to the principles of maritime law. *See, e.g., id.* § 512, Reporter's Note 3, at 40. The issue here is not the extent to which Congress *could* regulate labor relations on United States flag aircraft, but the extent to which it chose to do so. *Accord Air Line Stewards & Stewardesses Ass'n v. Northwest Airlines,* 267 F.2d 170, 176 (8th Cir.), *cert. denied,* 361 U.S. 901, 80 S.Ct. 208, 4 L.Ed.2d 156 (1959).

7. Conversely, the court in *Local 553, Transport Workers Union v. Eastern Air Lines,* 544 F.Supp. 1315 (E.D.N.Y.), *aff'd with modified relief,* 695 F.2d 668 (2d Cir.1982), on which plaintiff heavily relies, appears not to have considered fully the question before this court. Local 553 found itself in a situation similar to IUFA in the case at bench and sued to enforce the scope provision of its contract with Eastern. The court distinguished *Northwest Airlines* and *Trans World Airlines* because they "focused on where the transportation was, not where the employees were based." *Id.* 544 F.Supp. at 1322–23 n. 1. "[W]here the transportation [is]," however, is the central issue in this case.

"carrier" for purposes of the RLA was one subject to the Interstate Commerce Act (ICA). 45 U.S.C. § 151, *First* (1982). The ICA had been amended in 1920 to further circumscribe its territorial reach: the Act applied to transportation of persons or goods, or transmission of intelligence,

> [f]rom one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, *but only in so far as such transportation or transmission takes place within the United States.*

Transportation Act, 1920, § 400(1), ch. 91, 41 Stat. 474 (originally codified at 49 U.S.C. § 1(1)) (emphasis added). Most courts have concluded that Congress intended these limitations to apply to carriers by air as well. *E.g.*, *Air Line Dispatchers Ass'n*, 189 F.2d at 690; *Northwest Airlines*, 267 F.2d at 173; *Trans World Airlines*, 273 F.2d at 71.

Congress also had amended the ICA to include definitions of "air commerce" and "interstate and foreign air commerce." Such commerce embraced transportation of passengers or property

> between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, and any point within the same State, Territory, or possession, or the District of Columbia, but through the airspace over any place outside thereof; or wholly within the airspace over any Territory or possession or the District of Columbia.

Air Commerce Act of 1926, § 1, ch. 344, 44 Stat. 568 (1926) (codified at 49 U.S.C. § 171, repealed and reenacted with amendments at 49 U.S.C.App. §§ 1301(4), (20)).[8] While this language is less limiting than that pertaining to rail carriers, it does not include purely foreign flying. *Cf. Cheng v. Boeing Co.*, 708 F.2d at 1412 (Federal Aviation Act inapplicable to foreign flying; therefore, court lacked federal question jurisdiction as to foreign defendant in wrongful death actions).

One searches the RLA and ICA in vain for any expression of congressional intent that the RLA applies to purely foreign flying. The presumption against extraterritoriality, in conjunction with Congress' careful and thorough definitions of commerce, compels the conclusion that the RLA does not prescribe substantive law with respect to flights which are not within its definitions of commerce.[9]

B. Federal Enforceability of Contract Regulating Foreign Flying

█ While a contract between private parties ordinarily does not provide a basis for federal question jurisdiction, the Supreme Court has concluded that a contract entered into under the RLA "is a federal contract and is therefore governed and enforceable by federal law, in the federal courts." *Central Airlines*, 372 U.S. at 692, 83 S.Ct. at 962. The breadth of this holding, however, does not exceed that of the rationale on which it rests. The Court read § 204 of the RLA to impose on the parties a duty to establish boards of adjustment. *Id.* at 690, 83 S.Ct. at 961 (likening this duty to the duties to bargain and of fair representation). The substantial question arising under federal law therefore was "whether the contractual arrangements made by the parties are sufficient to discharge the mandate of § 204 and are consistent with the Act and its purposes." *Id.* at 691, 83 S.Ct. at 961. Concern for compliance with the statutory mandate need not and should not extend beyond the scope of that mandate itself. Since, as we

---

**8.** Air carriers, however, were not defined in the ICA until 1938. Civil Aeronautics Act of 1938, § 1(2), ch. 601, 52 Stat. 977 (1938) (subsequently repealed, reenacted with amendments, and codified at 49 U.S.C.App. § 1301(3)).

**9.** The court expresses no view on whether Congress could so regulate purely foreign air commerce consistent with the Constitution and the principles of international law.

have seen, the RLA does not apply to purely foreign flying, no substantial question of federal law appears to be raised by an action to enforce an arbitration agreement with respect to such flying.

The parties' voluntary extension of RLA policies and procedures to purely foreign flying does not alter this conclusion. *Cf. Morongo Band of Mission Indians*, 858 F.2d at 1385–86 (breach of contract is a state law claim, although contract is entered into under the authority of (but not compelled by) federal law). An argument can be made that, as a matter of contract law, since the relevant terms do not differentiate on the basis of location, those terms have the same meaning and are enforceable to the same extent when applied to purely foreign flying as to flying covered by the RLA. It would follow that any interpretation of those terms raises a federal question because, regardless of location, the same issue is determined; that is, an interpretation with respect to purely foreign flying also constitutes an interpretation with respect to all other flying, and vice versa. Such an approach is consistent with the Supreme Court's observation that "[t]he needs of the subject matter manifestly call for uniformity." *Central Airlines*, 372 U.S. at 691–92, 83 S.Ct. at 961–62. Congress, however, did not seek to impose uniformity of interpretation beyond the boundaries of the RLA. Nor need courts assume jurisdiction of cases involving purely foreign flying to effectuate the purposes of the RLA; compliance with the statute can be fully assured by enforcing it in cases falling within the RLA's geographic scope.[10]

## CONCLUSION

The judgment of the district court is AFFIRMED.

DOROTHY W. NELSON, Circuit Judge, dissenting:

I respectfully dissent.

My disagreement with my colleagues is not about the interpretation of our jurisprudence regarding extraterritorial jurisdiction, or, even, about the extraterritorial scope of the RLA. Rather, it is about whether extraterritoriality has anything to do with this case in the first place.

Reduced to its core, the dispute can be summarized as follows:

(1) In April 1985 the IUFA, certified representative of Pan Am's flight attendants, and Pan Am entered an agreement in the United States concerning Pan Am's flights within German territory. The agreement provides protection for IUFA flight attendants serving such routes (for example, limiting the number of foreign national flight attendants or subjecting all disputes involving the interpretation of the agreement to binding arbitration);

(2) The IUFA alleges that Pan Am violated that agreement by refusing

(a) to assign flight attendants from the Pan Am seniority list to certain flights, and (b) to provide those flight attendants with wages, benefits, and terms and conditions of employment in accordance with the provisions of the agreement.

(3) The Railway Labor Act, as amended to cover air carriers, imposes upon employers and employees "the duty ... to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions." 45 U.S.C. § 152. The Act further specifies the manner in which carriers shall "change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements." *Id.*

(4) The IUFA contends that the aforementioned agreement was breached contrary to the provisions of the RLA, that it constituted a unilateral change of employment conditions, and that Pan Am refused to follow customary procedure for solving such disputes. As a result, it filed an action in federal district court seeking to compel arbitration.

---

**10.** Nor do we accept the argument that our decision deprives plaintiff of a forum in which its claim may be heard. Any state court of general jurisdiction with jurisdiction of the parties may hear and determine this breach of contract dispute. We express no opinion, however, as to the outcome of that court's choice of law analysis.

Given these facts, it appears to me that the district court had jurisdiction over this case, one that arose under a federal statute, the RLA. The "extraterritorial" character of the dispute is suggested only by the fact that the *domestic* agreement embraced employees of Pan Am's foreign flights. Without more, this cannot suffice to push the controversy beyond our jurisdictional reach.[1]

It is true that the few courts to have addressed the issue have concluded that the RLA does not apply outside our borders. In this, they have been guided by the well-established presumption against extraterritoriality to check the scope of our national laws. *See supra* at 680–82. But ruling that the district court had jurisdiction over this case would not conflict with such a conclusion. The critical difference is that here there is a pre-existing agreement between the parties. The RLA is not triggered *directly* by the employers' alleged behavior in Germany but *indirectly* by their alleged breach of the agreement signed in the United States.[2] Because the hiring of foreign nationals might curtail jobs available for union members, because "the deprivation of a work opportunity involving the type of work traditionally performed by the Union is a change in work conditions," *Local 553, TWU v. Eastern Air Lines*, 544 F.Supp. 1315 (E.D.N.Y.), *aff'd and modified*, 695 F.2d 668 (2d Cir. 1982), and because the agreement explicitly embraced intra-German flights, appellants have stated a claim under the RLA.

We are not asked to apply the RLA to intra-German flights *of its own force.* Rather, we are asked to apply the RLA to a routine agreement between a union and a carrier. It is not the RLA that must be stretched beyond our boundaries; it is the agreement that brings us there. In sum, that the dispute revolved around foreign flights is jurisdictionally irrelevant. The RLA may have no operation in another country; that does not mean, however, that the agreements which the RLA purports to guarantee are limited in any way by territorial or national boundaries.

Nor are we being asked to hold that subject-matter jurisdiction was born of a contractual agreement. That, of course, would be impermissible. *See Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221 (9th Cir.1989) (holding that "a party cannot waive by consent or contract a court's lack of *subject matter* jurisdiction"). Here, the contract's alleged breach, not its explicit terms, forms the basis for the court's subject-matter jurisdiction.

None of the cases cited by the majority addresses this issue. In *Northwest Airlines*, the Union argued that under the RLA it was required to represent all flight attendants, including those hired to perform on foreign flights. Because the foreign flight attendants were not covered by the Act, the court concluded that the Union was not their certified bargaining agent. 267 F.2d at 174. Similarly, in *Trans World Airlines* the Union sought an injunction against TWA under the RLA, requiring the company to bargain with it with respect to non-nationals. In both instances, the unions invoked the RLA of its own force to police conduct beyond our boundaries. Lacking from these cases was the independent, and wholly domestic "hook" on which to hang the controversy, namely the existence of an agreement between the two parties that neither party could unilaterally modify by virtue of the RLA.

I am also convinced that the factors generally cited to deny jurisdiction where for-

---

1. Extraterritoriality is admittedly one of the looser concepts. As the jurisprudence in this field suggests, the decision whether to label a case "extraterritorial" is far from clear-cut. *Cf. Note—Constructing the State Extraterritorially: Jurisdictional Discourse, the National Interest, and Transnational Norms*, 103 Harv.L.Rev. 1273 (1990) [hereinafter *Note*]. In this case, in any event, I see no reason to cast the dispute in an extraterritorial light.

2. In other words, while a union's demands regarding pension plans for flight attendants on flights covered by the RLA would be subject to mandatory collective bargaining, *see Elgin, J. & E. Ry. Co. v. Brotherhood of Rail-Road Trainmen*, 302 F.2d 540, 544 (7th Cir.1962), the same request concerning intra-European flights would not. In this latter hypothesis, the RLA would not apply directly because the case involves an extraterritorial incident, and it would not apply indirectly because there is no domestic agreement to trigger it.

eign interests are involved are absent from this case. First, the dispute clearly has a "substantial, direct, and foreseeable effect upon or in the territory" of the United States. *Restatement (Third) of Foreign Relations Law*, § 403(2)(a). Depriving U.S. citizens of employment opportunities, even abroad, will almost certainly have some effect within the United States.

Second, I disagree with the suggestion that an American exercise of jurisdiction would clash with another state's jurisdictional assertion. Enumerating the policy reasons justifying the presumption against extraterritoriality, the majority evokes "the risk of 'outright collisions between domestic and foreign law.'" *Supra* at 680 (quoting *Pfeiffer*, 755 F.2d at 557). But this belligerent scenario is far less likely to occur than the majority intimates. Courts of the United States have traditionally *declined* to apply our laws to foreign flag carriers, for "the law of the flag supercedes the territorial principle." *Lauritzen*, 345 U.S. at 585, 73 S.Ct. at 929; *see also McCulloch*, 372 U.S. at 21, 83 S.Ct. at 677 (U.S. labor laws do not apply to foreign seamen employed on vessels registered under a foreign flag). By the same token, regulation by Germany of the labor relations of a foreign carrier might well be unreasonable. *Cf. Restatement (Third) of Foreign Relations Law* § 403, Comment c; Reporter's Note 4.[3]

A third concern expressed by courts is whether a country's decision to police a given conduct will interfere with justified expectations. *See Restatement (Third) of Foreign Relations Law*, § 403(2)(d). Here, both appellant and appellees undeniably anticipated that the collective bargaining agreement would apply to international flights. For decades, Pan Am had routinely honored such agreements. Its breach today cannot undo the justified expectations born of the past.

In my view, the most troubling aspect of this case remains the fate of the foreign flight attendants whose work appellants claim for their own members. However, the potential harm they might suffer would result not from our intervention, but from the agreement reached by Pan Am and the IUFA. Our task, accordingly, is limited to ensuring that the agreement not be violated in contravention of the RLA.

The court has a responsibility to act in the face of an alleged breach that might cause serious injury, for "collective bargaining agreements are central to American labor law and are the essential threads of its fabric." *Airline Pilots Ass'n., Etc. v. Taca Int'l Airlines*, 748 F.2d 965, 968 (5th Cir.1984). Because I do not wish to approve of judicial passivity by way of extraterritorial escape, I must respectfully part company with my colleagues.

---

**3.** My colleagues rely on *Laker Airways*, 731 F.2d 909, to refute this argument. *Supra* at 681 n. 5. But the analogy is misplaced for it is well-established that the scope of acceptable jurisdiction varies with the underlying legal norm. Although I confess discomfort with such distinctions, what is true of antitrust regulation is not necessarily true of labor law; asserting jurisdiction to prescribe the conduct of a foreign air carrier might well be deemed reasonable where the former is at issue, and unreasonable where the latter is at stake. *See Restatement (Third) of Foreign Relations Law* § 403, Comment c; *see also Note, supra,* at 1293–94.